## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAMAC FUND, LP, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>              v.<br><br>NABORS ENERGY TRANSITION SPONSOR II LLC, ANTHONY G. PETRELLO, WILLIAM J. RESTREPO, GUILLERMO SIERRA, COLLEEN CALHOUN, STEPHEN M. TRAUBER, and COLIN RICHARDSON,<br><br>                  Defendants,<br><br>-and-<br><br>NABORS ENERGY TRANSITION CORP. II,<br><br>                  Nominal Defendant. | Civil Action No. 26-1289<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Camac Fund, LP ("Plaintiff") alleges for its complaint against Nabors Energy Transition Sponsor II LLC (the "Sponsor"), Anthony Petrello, William Restrepo, Guillermo Sierra, Colleen Calhoun, Stephen Trauber and Colin Richardson, and Nominal Defendant Nabors Energy Transition Corp. II (the "SPAC"), the following upon knowledge as to itself and its own actions, and upon information and belief as to all other matters.

## I.    INTRODUCTION

1.    This case involves the misappropriation of a $29 million termination payment by the managers of a special purpose acquisition company, or SPAC, at the expense of public stockholders.

2.      The SPAC was formed to complete a business combination with a private company. The structure is a boom or bust proposition: if Defendants successfully completed a business combination, they would own twenty percent of the public portion of the acquired company; if Defendants failed to complete a business combination, they would lose their entire investment in the SPAC.

3.      Prior to raising money from the public, the SPAC issued millions of shares of Class B common stock ("Founder Shares") at less than a penny per share to the Sponsor and individual Defendants.

4.      In July 2023, the SPAC completed an initial public offering ("IPO") of Class A common stock (the "Public Shares") at $10.00 per share, generating proceeds of approximately $305 million. The proceeds of the IPO were placed in a trust account (the "Trust Account") pending the SPAC's business combination or liquidation.

5.      The SPAC had two years after the IPO to complete a business combination. If the SPAC successfully completed a transaction, Defendants' Founder Shares would convert to Public Shares worth tens of millions of dollars on paper. If, however, the SPAC failed to close a deal, then the SPAC's assets would be returned to investors and the Founder Shares would expire worthless.

6.      That economic bargain—*i.e.*, the Sponsor's risk of a complete loss of its investment in exchange for the prospect of an exponential return—is the crux of the SPAC model. Public stockholders relied on this incentive structure to motivate the Sponsor to identify and close an attractive business combination, and thus mitigate the risk that stockholders' capital would be tied up for two years without meaningful returns.

7.      Defendants repeatedly acknowledged this structure in public filings (*i.e.*, that they would lose their entire investment if the SPAC did not complete a business combination), and each Defendant contractually agreed in connection with the IPO that they would have "no right, title, interest or claim of any kind in or to *any monies held in the Trust Account or any other asset* of the [SPAC] as a result of any liquidation." (Emphasis added.)

8.      In February 2025, Defendants announced a proposed transaction with e2Companies LLC ("e2"), an energy management firm. The transaction valued e2 at $500 million and Defendants touted the company as a "needle in a haystack."

9.      However, before shareholders had an opportunity to approve the transaction, e2 reneged. In July 2025, the SPAC sued for specific performance and alleged that e2 had experienced a "classic case of seller's remorse" and that it had "expressly stated it [had] no desire to close [the] deal." *See Nabors Energy Transition Corp. II, et al. v. e2Companies LLC*, 2025-0810-BWD (Del. Ch.) (the "Merger Litigation").

10.      Three months later, in October 2025, Defendants announced that they had agreed to a mutual termination of the e2 transaction and a resolution of the Merger Litigation, through which the SPAC waived all rights to enforce the transaction agreement and released all claims against the counterparty. In return, e2 agreed to pay a break-up fee of at least $29.23 million, payable in two installments over the course of three years, with potentially additional payments if e2 were to enter into a subsequent merger transaction.

11.      At the time of the termination, Defendants remained silent as to how and when the break-up fee assets would be distributed to public stockholders.

12.      On October 27, 2025, Defendants proposed a plan to extend the life of the SPAC indefinitely for purposes of distributing the break-up fee to stockholders, but *only* on Defendants'

self-interested terms: first, the assets (including the break-up fee) would be distributed *pro rata* to public stockholders but also to Defendants as holders of Founder Shares, even though Defendants waived their rights to distributions in the absence of a business combination; and second, Defendants would be entitled to collect "from the Trust Account up to $0.50 per share and up to 100% of the interest that accrues in the future to pay fees and expenses incurred by or on behalf of the Company *since its formation*," "including "approximately $10 million of fees and expenses" and "$4.1 million of loans" from the Sponsor. (Emphasis added)

13.    The reaction to the proposal was unsurprisingly negative, and on November 3, 2025 Defendants attempted to persuade investors to approve the proposal by eliminating the provision that allowed withdrawal of up to $0.50 per Public Share from the Trust Account. However, Defendants still sought to "deposit future interest earned on the funds held in the Trust Account into the Company's operating account" for Defendants' use. In other words, rather than simply returning capital to investors as required by the SPAC structure and distributing additional amounts as the payment installments were received, Defendants proposed for purely self-interested purposes that millions of dollars of capital would remain tied up indefinitely in trust and would not accrue interest or other investment return, all of which would be diverted to Defendants.

14.    On November 14, 2025, shareholders voted against the proposal by a wide margin. Thereafter, having failed to obtain shareholder approval for their extension proposal, Defendants opted to simply liquidate the SPAC and keep the break-up fee assets for themselves.

15.    In November 2025, the Company announced that it would redeem all outstanding Class A shares for a per-share redemption amount from distribution of the Trust Account and not including the value of the break-up fee. Defendants claimed that the "redemption will completely extinguish public shareholders' rights as shareholders (including the right to receive further

liquidation distributions, if any)," and thus any remaining assets (including the break-up fee) would be diverted to Defendants.

16.     Defendants' misappropriation is expressly prohibited by the SPAC's governing documents. Defendants failed to complete a business combination, and thus have "no right, title, interest or claim" to the SPAC's assets pursuant to agreements that Defendants themselves drafted.

17.     This action seeks the distribution of all residual assets of the SPAC solely to public stockholders and monetary damages for the harm caused by Defendants to the SPAC and its investors.

## II.    THE PARTIES

18.     Plaintiff Camac Fund, LP is a Delaware limited partnership with its principal place of business in Jacksonville, Florida. Plaintiff held Class A Public Shares of the SPAC at the time of the redemption on December 3, 2025.

19.     Nominal Defendant is a special purpose acquisition company, or "SPAC," organized as a Cayman Islands exempted company.

20.     The Sponsor is a Cayman Islands limited liability company.

21.     Non-party Nabors Industries Ltd. ("Nabors") is a Bermuda exempted company with its principal place of business in Houston, Texas. Nabors is the indirect parent of the Sponsor and Nabors Lux 2 S.a.r.l. ("Nabors Lux").

22.     Defendant Petrello is the SPAC's President, Chief Executive Officer, and a member of the Board. He has been President and CEO of Nabors since 2011.

23.     Defendant Restrepo is the SPAC's Chief Financial Officer. He has been the Chief Financial Officer of Nabors since 2014.

24.     Defendant Sierra is the SPAC's Vice President of Energy Transition. He has been the Vice President, Strategic Initiatives—Energy Transition at Nabors since 2021.

25.     Defendant Calhoun is a member of the SPAC's Board of Directors. She is an Operating Partner at Engine Ventures, an investment firm.

26.     Defendant Trauber is a member of the SPAC's Board of Directors.  He is a Managing Director and Chairman and Global Head of Energy and Clean Technology at Moelis & Company.

27.     Defendant Richardson is a member of the SPAC's Board of Directors.  He is a Managing Director at MA Financial Australia.

### III.    JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action under 28 U.S. Code § 1332(a) and (d) and 28 U.S.C. § 2201.

29.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (2).

30.     This Court has jurisdiction over Defendants because they transact a substantial amount of business in New York, have substantial ties to New York, and/or otherwise maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

31.     This Court also has jurisdiction over Defendants because the Sponsor Agreement (defined below), to which each Defendant is a party, states that it "shall be governed by and construed and enforced in accordance with the laws of the State of New York," and that the "parties hereto (i) all agree that any action, proceeding, claim or dispute arising out of, or relating in any way to, this [Sponsor] Agreement shall be brought and enforced in the courts of New York City, in the State of New York, and irrevocably submit to such jurisdiction and venue, which jurisdiction

and venue shall be exclusive and (ii) waive any objection to such exclusive jurisdiction and venue or that such courts represent an inconvenient forum."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Nabors Forms The Sponsor And The SPAC To Complete A Business Combination

32.    Nabors is a global oil and gas drilling contractor. It formed the SPAC and the Sponsor in 2023 for the purpose of "effecting a merger, amalgamation, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses."

33.    Nabors, through the Sponsor and the Board (which it selected), controls and manages the SPAC.

34.    The SPAC's capital structure consists of two classes of common stock: Class A Public Shares issued to the public through an IPO and Class B Founder Shares issued to Defendants for a nominal amount.

35.    On April 24, 2023, the Sponsor purchased 5,750,000 Founder Shares for $25,000 (*i.e.*, approximately $0.004 per share). Thereafter, in June 2023, the SPAC issued an additional 2,875,000 additional Founder Shares to the Sponsor. On July 13, 2023, the SPAC issued 100,000 Founder Shares to Defendants Calhoun and Trauber (50,000 shares each). On June 25, 2024, the Sponsor transferred 50,000 Founder Shares to Defendant Richardson in connection with his appointment as director.

36.    The SPAC was designed so that the Defendants would profit through their Founder Shares only if the SPAC successfully completed a business combination. In the event of a business combination, the Class B Founder Shares would be convertible to Class A Public Shares, and thus would be worth exponentially more than the nominal price paid by the Sponsor. Otherwise,

without a business combination, the Founder Shares would become worthless, and Defendants would lose their entire investment.

37.    On July 18, 2023, the SPAC completed its IPO. The SPAC sold 30,500,000 units of Class A Public Shares at a price of $10.00 per share, generating proceeds of approximately $305 million. Each unit consisted of one Class A ordinary share and one half of one redeemable public warrant. Each public warrant entitled the holder to purchase one Class A ordinary share at a price of $11.50 per share. The proceeds of the IPO were placed in the Trust Account pending the SPAC's business combination.

38.    Simultaneously with the closing of the IPO, the SPAC sold 9,540,000 private placement warrants at a price of $1.00 per private placement warrant to the Sponsor, generating gross proceeds of $9,540,000.

39.    In connection with the IPO, Defendants forfeited certain of the Founder Shares, resulting in the Sponsor and other Defendants holding an aggregate of 7,625,000 Founder Shares— approximately 20% of the outstanding common stock.

40.    The Founder Shares were convertible to Public Shares, and thus, at $10 per share, Defendants' ownership interest would be valued at over $76 million.

41.    In connection with the IPO, Defendants confirmed that they would not profit from their investment in the SPAC unless they successfully completed a business combination for stockholders.

42.    Each Defendant agreed to a letter agreement with the SPAC (the "Sponsor Agreement") pursuant to which they waived any and all entitlement to the assets of the SPAC in connection with a liquidation, which would occur if the Defendants failed to complete a business combination.

43.     The Sponsor Agreement stated that, as to each Defendant, "it, he or she has no right, title, interest or claim of any kind in or to any monies held in the [SPAC's] Trust Account or any other asset of the [SPAC] as a result of any liquidation of the [SPAC] with respect to the Founder Shares."

44.     The IPO prospectus also made clear that "in the event the [SPAC] [did] not consummate a business combination within 24 months from the closing of this offering, the founder shares and warrants will expire worthless." Defendants repeatedly reaffirmed the same in the SPAC's periodic filings thereafter.

45.     Following the IPO, the SPAC had two years—or until July 18, 2025—to complete a business combination.

**B.    The SPAC Signs A Transaction Agreement With e2, Which Falls Through**

46.     On February 11, 2025, the SPAC announced that it had reached a Business Combination Agreement ("BCA") for a merger with e2 (the "Transaction").

47.     The Transaction contemplated a pro forma value for the post-closing company of approximately $500 million, of which public stockholders would acquire a significant percentage.

48.     After the announcement, the SPAC touted to investors e2's prospects and the value of the business combination, including that Defendants "found a needle in a haystack with e2."

49.     By summer 2025, however, the business combination had not been consummated, and in July 2025 e2 formally reneged on the Transaction (the "Termination").

50.     On July 11, 2025, the SPAC filed the Merger Litigation against e2, alleging in its complaint that e2 had experienced a "classic case of seller's remorse" and that e2 had "expressly stated it [had] no desire to close [the] deal." *See Nabors Energy Transition Corp. II v. E2 Companies LLC*, C.A. No. 2025-0810-BWD (Del. Ch.). The Merger Litigation sought,

among other things, specific performance compelling e2 to perform its obligations under the transaction agreement.

51.     At the time of the Termination, the SPAC had binding contractual rights and pending legal claims against e2 with substantial value.

52.     Under the BCA, the SPAC had an express contractual right to seek specific performance compelling e2 to close the Transaction. Further, the BCA provided that the initiation of an action to enforce specifically the terms and provisions of the BCA would automatically extend the deadline under the BCA to close.

53.     In the Merger Litigation, the SPAC alleged that e2 had breached the BCA by, among other things: (i) violating Section 7.02 by refusing to cooperate in the preparation and filing of the S-4 registration statement required to consummate the Merger; (ii) violating Section 7.08 by failing to use its reasonable best efforts to consummate the transaction; (iii) violating Section 7.01 by soliciting and discussing alternative deals behind the SPAC's back in violation of the non-solicitation provision; (iv) violating Section 7.05 by failing to provide information concerning its business as reasonably requested; (v) violating Section 6.01 by negotiating material contracts without seeking the SPAC's consent; and (vi) violating Section 7.16 by failing to deliver PCAOB-compliant financial statements as required. The SPAC alleged that the closing conditions set forth in the BCA had been satisfied or waived and e2's breaches materially contributed to the failure to close.

54.     Thus, at the time of the Termination, the SPAC and its stockholders had substantial legal rights and claims against e2, including the right to seek specific performance of a merger valued at $500 million in pre-money equity, as well as claims for monetary damages arising from e2's breaches.

55.    On July 16, 2025, the SPAC's shareholders approved a proposal to extend the business combination deadline, without further shareholder approval, for up to twelve separate one-month extensions (*i.e.*, to a maximum of July 18, 2026). For each extension, Nabors Lux agreed to deposit $250,000 into the Trust Account.

56.    Throughout the remainder of 2025 and into 2026, the SPAC elected to extend its deadline in one-month intervals.

### C.    Defendants Announce the Termination Agreement And Propose To Convert The SPAC Into Their Own Piggy Bank

57.    On October 14, 2025, the SPAC announced that it had terminated the Transaction with e2 and entered into a settlement agreement (the "Termination Agreement"), pursuant to which the SPAC waived its rights to enforce the transaction agreement, released claims for breach, and agreed to dismiss the Merger Litigation with prejudice.

58.    In return, e2 issued a secured promissory note to the Company in an aggregate principal amount of $29.23 million (the "Break-Up Fee").

59.    Under the terms of the promissory note, $14.615 million matures on March 31, 2026 ($3.5 million of which was required to be prepaid on or before December 31, 2025) (the "First Note"); and $14.615 million matures on October 14, 2028 (the "Second Note").

60.    At the time of the Termination Agreement, Defendants did not disclose how the value of the Break-Up Fee would be distributed to public stockholders. Upon information and belief, Defendants structured the Break-Up Fee to vest over time to make it easier for them to retain it for themselves after the redemption of public stockholders.

61.    On October 27, 2025, approximately two weeks after announcing the Termination, Defendants filed a proxy statement seeking shareholder approval of a proposal to amend the

SPAC's articles of association to extend the SPAC's life indefinitely and delay its liquidation (the "Indefinite Extension Proposal").

62.     The proxy statement disclosed that if the Indefinite Extension Proposal was approved, the Break-Up Fee would be distributed "pro rata" between Public Shares and Founder Shares. In other words, Defendants' proposal contemplated that the holders of Founder Shares would participate equally with public stockholders in any distribution of the Break-Up Fee, despite their agreement waiving rights to distributions if the SPAC failed to complete a business combination.

63.     Moreover, the Indefinite Extension Proposal would have provided Defendants with the right to "withdraw from the Trust Account up to $0.50 per share and up to 100% of the interest that accrues in the future to pay fees and expenses incurred by or on behalf of the Company since its formation," including "approximately $10 million of fees and expenses" and "$4.1 million of loans" from the Sponsor. Defendants otherwise had no rights to make such withdrawals and, under the SPAC structure, were required to forfeit their investments after failing to complete a business combination.

64.     The proposal was received poorly by investors, who had no obligation or incentive to share the value of the Break-Up Fee, indefinitely delay distribution, or refund Defendants' at-risk investments from the Trust Account.

65.     Indeed, the Trust Funds could be distributed immediately, and all future assets received by the SPAC (including the Second Note) could be distributed thereafter upon receipt. To the extent that the SPAC had ongoing expenses relating to wind down (because of the delay in the payment of the Break-Up Fee as negotiated by Defendants), the Investment Management Trust Agreement already provides up to $100,000 to cover "dissolution expenses."

66.     On November 3, 2025, Defendants amended the Indefinite Extension Proposal in an attempt to obtain shareholder support, which also failed. The amended proposal eliminated the provision that would have allowed the Company to withdraw up to $0.50 per share from the Trust Account, but retained the provision that all future interest earned on the Trust Account would be deposited into the SPAC's operating account and could be used by Defendants to reimburse themselves. The amended proposal also continued to assume that Defendants would be able to participate *pro rata* in the distribution of the Break-Up Fee despite having waived such rights.

67.     On November 14, 2025, shareholders voted against the Indefinite Extension Proposal, leading to a plan by Defendants to simply commandeer the entirety of the Break-Up Fee assets for themselves.

68.     On November 17, 2025, the SPAC announced that it would redeem all outstanding Class A ordinary shares as of the close of business on December 3, 2025 in exchange *only* for the amounts held in the Trust Account—*i.e.*, not the Break-Up Fee.

69.     Defendants stated expressly that the "redemption will completely extinguish public shareholders' rights as shareholders (*including the right to receive further liquidation distributions, if any*)."

70.     Following the redemption of Public Shares, Defendants, as holders of the Founder Shares, would be positioned to distribute the SPAC's remaining assets, including the Break-Up Fee, solely to themselves.

71.     On December 3, 2025, the SPAC redeemed all outstanding Class A ordinary shares for $11.35445 per share.

72.     Defendants' decision to appropriate the entirety of the Break-Up Fee was self-interested and violated their fiduciary duties and contractual obligations under the Sponsor Agreement and the SPAC's governing documents.

73.     Defendants have no legal or equitable basis whatsoever to distribute to themselves the SPAC's residual assets, including the Break-Up Fee, and all such assets must be distributed to the Class of public shareholders defined below.

## V.      CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this Action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and as a class action on behalf of all holders of Class A Public Shares as of the SPAC's redemption on December 3, 2025 (the "Class").

75.     The Class does not include Defendants named herein, and any person, firm, trust, corporation, or other entity related by blood or marriage to or affiliated or associated with any of the Defendants or their successors in interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the SPAC's shares were beneficially owned by hundreds or thousands of geographically dispersed stockholders.

77.     There are questions of law and fact common to the Class, which predominate over questions affecting any individual Class member. These common questions include, *inter alia*:

- Whether the Break-Up Fee is a corporate asset of the SPAC and rightfully belongs to, and should be distributed to, holders of Class A Public Shares;

- Whether Defendants breached their contractual and fiduciary duties to stockholders through their scheme to misappropriate the Break-Up Fee; and

- The existence and extent of injury to Plaintiff and the Class caused by such breaches, violations and misconduct.

78.     No difficulties are likely to be encountered in the management of this case as a class action.

79.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

80.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

81.     Plaintiff's claims are typical of the claims of other Class members, and Plaintiff has the same interests as other Class members. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

82.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

83.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I

**Declaratory Judgment
As To The SPAC's Residual Assets**

84.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

85.     As set forth in detail above, pursuant to the Sponsor Agreement and Defendants' public representations, Defendants have no right, claim or other entitlement to the Break-Up Fee in connection with the SPAC's dissolution.

86.     The Break-Up Fee is a corporate asset of the SPAC and rightfully belongs to, and should be distributed to, holders of Class A Public Shares, alongside the proceeds of the Trust Account. Defendants have expressly waived, in connection with raising funds from the public markets, any entitlement to any asset of the SPAC in a dissolution.

87.     Plaintiff is entitled to a declaratory judgment that Defendants have no entitlement to the Break-Up Fee and that the Break-Up Fee must be distributed equitably to holders of Class A Public Shares.

88.     Plaintiff seeks all appropriate injunctive relief necessary to enforce the declaratory judgment entered by this Count. In the absence of such injunctive relief, stockholders will incur significant monetary and non-monetary harm.

### COUNT II

**Claim For Breach Of The Sponsor Agreement**

89.     Plaintiff repeats and realleges all the allegations set forth in the paragraphs above as if fully set forth herein.

90.     Each Defendant is a party to the Sponsor Agreement.

91.     Plaintiff and the Class, as public stockholders, are parties to and/or third-party beneficiaries of the Sponsor Agreement.

92.     The Sponsor Agreement does not define the term "parties" to exclude public stockholders, and references throughout the term "Public Shareholders," which is expressly defined to mean "the holders of securities issued in the [IPO]." The Sponsor Agreement was executed as part of the IPO and granted the SPAC, and its public stockholders, rights and protections in connection with their acquisition of SPAC shares, which stockholders have standing to enforce directly.

93.     Even if public stockholders are not direct parties to the Sponsor Agreement, they are third-party beneficiaries because the contract was intended for the exclusive benefit of public stockholders and the benefit was substantial, immediate, and not incidental.

94.     For example, the provision waiving all "right, title, interest or claim of any kind in or to any monies held in the [SPAC's] Trust Account or any other asset of the [SPAC] as a result of any liquidation"—*i.e.*, a contractual assurance that Defendants will not misappropriate assets from the SPAC and its stockholders—exclusively benefits holders of Class A Public Shares who are entitled to receive the assets of the SPAC upon dissolution.

95.     The Sponsor Agreement does not contain a provision disclaiming third-party beneficiaries.

96.     Stockholders are the exclusive beneficiaries to the Sponsor Agreement and have standing to enforce those contractual rights. The Sponsor Agreement enabled the completion of the IPO, and the SPAC's effort to raise funds from public stockholders would not have been successful otherwise.

97.     Defendants' decision to redeem the Class A Public Shares and liquidate and distribute the Break-Up Fee to themselves was a breach of the Sponsor Agreement.

98.     The Sponsor Agreement provides that: "The Sponsor and each Insider [*i.e.*, the Defendants] acknowledges that it, he or she has no right, title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation of the Company with respect to the Founder Shares."

99.     The Break-Up Fee is an amount payable "as a result of [a] liquidation" and thus Defendants disclaimed any entitlement to that asset. They have no "right, title, interest or claim" to that asset, which must be distributed to Plaintiff and the Class.

## COUNT III

### Derivative Claim For Breach Of Contract
### (Alleged In The Alternative To Count II)

100.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

101.    Plaintiff sets forth this Count III in the alternative to Count II.

102.    Defendants entered into the Sponsor Agreement, a valid contract, with the SPAC and agreed that they have "no right, title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation."

103.    Defendants breached the Sponsor Agreement for the reasons set forth in Count II.

104.    Plaintiff is entitled to bring this action derivatively on behalf of SPAC because a majority of the Board is affiliated with and/or has a financial interest in Nabors and the Sponsor, and thus has financial interests in the distribution of the SPAC's assets to holders of Class B Founder Shares.

105.    Defendants Petrello, Restrepo and Sierra are senior executives at Nabors, which owns and controls the Sponsor and thus each have a direct and substantial financial interest in the Sponsor's Founder Shares.

106.    Further, Defendants Calhoun, Trauber, and Richardson each directly own Founder Shares, and thus also have substantial financial interests in the distribution of the SPAC's assets, including the Break-Up Fee, to holders of Class B Founder Shares rather than public stockholders.

107.    Defendants cannot fairly and impartially consider the SPAC's claims arising from the distribution of assets.

## COUNT IV

### Derivative Claim For Breach Of Fiduciary Duty

108.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

109.    Defendants owe fiduciary duties to the SPAC by virtue of their positions as officers and/or directors.

110.    Defendants breached their fiduciary duties by intentionally negotiating the Termination Agreement and waiving the SPAC's rights and claims with respect to the Transaction in exchange for the Break-Up Fee, which Defendants planned to appropriate for themselves as the holders of Class B Founder Shares.

111.    Defendants are each self-interested in the Termination and the distribution of the Break-Up Fee because each is a holder and/or has a direct financial interest in the Class B Founder Shares. Each participated in this concerted scheme to exchange corporate rights and assets for monetary benefits solely to themselves.

112.    Under the Sponsor Agreement, Defendants waived any entitlement to the SPAC's assets in a dissolution, and therefore Defendants have no legal, equitable or contractual entitlement, or business purpose, or any other legitimate reason, to appropriate the Break-Up Fee for their own benefit. They plan to do so solely to advance their own financial interests.

113.    Defendants' actions are not entitled to the protection of the business judgment rule because of their conflicting financial self-interests. Each Defendant stands to benefit personally from the distribution of the Break-Up Fee to holders of Class B Founder Shares rather than to holders of Class A Public Shares, and thus each Defendant had a financial interest in the outcome of the Termination that diverged from the interests of the SPAC and its public stockholders. Accordingly, Defendants' decision to negotiate the Termination Agreement and appropriate the Break-Up Fee for themselves must be weighed under the entire fairness standard.

114.    The Termination Agreement cannot satisfy entire fairness because the transaction was structured to deprive public stockholders of the Break-Up Fee—a corporate asset obtained in exchange for the waiver of the SPAC's valuable rights against e2—while allowing Defendants to retain that asset for themselves despite having contractually agreed that they have "no right, title, interest or claim" to any asset of the SPAC in a liquidation. The transaction was unfair both as to process and price.

115.    Plaintiff is entitled to bring this action derivatively for the reasons set forth in Count III.

## COUNT V

### Declaratory Judgment
### As To Indemnification

116.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

117.    The SPAC's Amended and Restated Memorandum and Articles of Association (the "Articles") provide that the SPAC shall indemnify directors and officers for liability arising from "carrying out their functions *other than such liability* (if any) that they may incur by reason of their own actual fraud or wilful default." (Emphasis added.)

118.    Indeed, the Articles make clear that the SPAC has no indemnification obligations as to "liability [that] arises through the actual fraud or wilful default of such Indemnified Person."

119.    The Articles state that "[i]f it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Company."

120.    For the reasons above, the Defendants committed actual fraud and/or wilful default as to their duties by orchestrating a transaction by the SPAC through which they obtained the Break-Up Fee for their own personal financial interests at the direct expense of the SPAC and Class A stockholders.

121.    Plaintiff is entitled to a declaratory judgment that Defendants are not entitled to indemnity.

122.    Plaintiff seeks all appropriate injunctive relief necessary to enforce the declaratory judgment entered by this Count. In the absence of such injunctive relief, stockholders will incur significant monetary and non-monetary harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring as to Count II that this suit may proceed as a class action on behalf of the Class and Counts III and IV are properly asserted derivatively on behalf of the SPAC;

B.      Declaring and ordering that Defendants have no rights or entitlement to the proceeds of the Break-Up Fee, which must be distributed equitably to Plaintiff and the Class;

C.      Declaring that the Defendants breached the Sponsor Agreement and their fiduciary duties by entering into the Termination Agreement and misappropriating the Break-Up Fee, and ordering that the Break-Up Fee must be distributed equitably to Plaintiff and the Class;

D.      Declaring that Defendants are not entitled to indemnity pursuant to the Articles;

E.      Granting any additional extraordinary, equitable and injunctive relief against all Defendants to the fullest extent permitted by law and/or equity and consistent with the allegations above;

F.      In the alternative to the equitable relief set forth above, awarding Plaintiff and the Class damages, and pre-judgment and post-judgment interest, in an amount to be proven at trial;

G.      Awarding to Plaintiff the costs of the action, including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses; and

H.      Granting such further relief as the Court deems just and equitable.

Dated: February 16, 2026

*/s/ Aaron T. Morris*
**MORRIS KANDINOV LLP**
Aaron T. Morris (5675178)
Andrew W. Robertson (4288882)
305 Broadway, 7th Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law

*Attorneys for Plaintiff and the Class*