UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAMAC FUND, LP, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  -v-<br><br>NABORS ENERGY TRANSITION SPONSOR II, LLC, et al.,<br><br>        Defendants. | 26-cv-1289 (JSR)<br><br>OPINION & ORDER |

JED S. RAKOFF, U.S.D.J.:

Defendant Nabors Energy Transition Sponsor II, LLC (the "Sponsor") and related individual defendants Anthony Petrello, William Restrepo, Guillermo Sierra, Colleen Calhoun, Stephen Trauber, and Colin Richardson, as well as nominal defendant Nabors Energy Transition Corporation II ("NETD"), (collectively, "defendants") have moved to dismiss this action brought by plaintiff Camac Fund, LP ("Camac") involving a failed business combination between NETD and e2Companies, LLC ("e2"). ECF No. 20. After receiving full briefing, the Court heard argument on the motion on June 16, 2026. For the reasons discussed below, the Court grants the defendants' motion in its entirety.

I.   Background

   a. The Parties and the SPAC Structure

1

The following allegations are drawn from the amended Complaint. NETD is a Special Purpose Acquisition Company ("SPAC") organized as a Cayman Islands exempted company formed by Nabors Industries Ltd. ("Nabors") for the purpose of effectuating a business combination with a private target. ECF No. 17 ("Am. Compl.") ¶¶ 19, 32. Nabors formed NETD and the Sponsor in 2023, and controls and manages the SPAC through the Sponsor and a Board of Directors of its own selection. Id. ¶ 33.

NETD's capital structure consists of two classes of common stock. Class A stocks were ordinary shares sold to the public ("Public Shares"), while Class F shares were granted to the founders of NETD ("Founder Shares"). Prior to NETD's initial public offering, the Sponsor received 5,750,000 Class F "Founder Shares" for $25,000 and was subsequently issued an additional 2,875,000 Founder Shares. Id. ¶ 35. Individual defendants Calhoun and Trauber each received 50,000 Founder Shares in connection with their appointments as independent directors; defendant Richardson later received 50,000 Founder Shares upon joining the Board. Id. Following certain forfeitures in connection with the IPO, the Sponsor and individual Defendants held an aggregate of 7,625,000 Founder Shares. Id. ¶ 39. At $10 per share, Defendants' ownership interest would have been valued at over $76 million had a business combination been completed. Id. ¶ 40.

2

On July 18, 2023, NETD completed its IPO of 30,500,000 Class A Public Shares at $10.00 per share, generating approximately $305 million in proceeds. Am. Compl. ¶ 37. The proceeds were then placed in a trust account pending a business combination. Id. Simultaneously, the SPAC sold 9,540,000 private placement warrants to the Sponsor at $1.00 each, generating an additional $9,540,000. Id. ¶ 38.

The SPAC described above was designed as a "boom-or-bust" proposition: if defendants successfully completed a business combination, their Founder Shares would convert to Class A Public Shares and yield an outsized return; if no combination was completed, the Founder Shares would expire worthless. Id. ¶¶ 2, 5-6, 36. NETD had until July 18, 2025 -- two years from its IPO -- to consummate a transaction. Id. ¶ 45.

b. The Sponsor Agreement

In connection with the IPO, each defendant entered into an agreement with the SPAC (the "Sponsor Agreement"), pursuant to which they waived any entitlement to the SPAC's assets in the event of a liquidation following a failed business combination. Am. Compl. ¶ 42. Specifically, each defendant "acknowledge[d] that it, he or she has no right, title, interest or claim of any kind in or to any monies held in the Trust Account or any other asset of the Company as a result of any liquidation of the Company with respect to the Founder Shares." Id. ¶ 43. The IPO prospectus likewise

3

disclosed that "in the event the Company does not consummate a business combination within 24 months from the closing of this offering, the founder shares and warrants will expire worthless." Id. ¶ 44.

### c. The e2 Transaction

In early 2025, NETD announced an agreement to combine with e2, an energy management firm, at a value of approximately $500 million. Am. Compl. ¶¶ 46-47. But in July 2025, e2 formally reneged, and NETD promptly filed suit seeking specific performance. Id. ¶¶ 49-50. During this time, NETD's shareholders approved extensions of the business combination deadline in one-month intervals, up to a maximum of July 18, 2026. Id. ¶ 55.

On October 14, 2025, NETD and e2 entered into a settlement agreement, pursuant to which NETD waived its rights to enforce the business combination agreement, released all claims, and dismissed the litigation with prejudice. Id. ¶ 57. In exchange, e2 issued a secured promissory note in the amount of $29.23 million (the "Break-Up Fee"), structured as two installments: $14.615 million maturing March 31, 2026 (with $3.5 million prepayable by December 31, 2025), and $14.615 million maturing October 14, 2028. Id. ¶¶ 58-59.

### d. Post-Transaction

Following announcement of the settlement, the defendants did not disclose how the Break-Up Fee would be distributed to the

public shareholders. Am. Compl. ¶ 60. On October 27, 2025, the defendants filed a proxy statement proposing to amend NETD's articles of association to extend the SPAC's existence indefinitely, subject to conditions. Under the proposal, the Break-Up Fee would be distributed pro rata to both public stockholders *and* to defendants as holders of Founder Shares. Id. ¶¶ 61-64. Additionally, defendants would be permitted to withdraw from the Trust Account up to $0.50 per share and up to 100% of future interest to reimburse approximately $10 million in fees and expenses and $4.1 million in loans from the Sponsor. Id.

After investors reacted negatively, defendants amended the proposal on November 3, 2025 to eliminate the $0.50 per-share trust withdrawal, but retained the provision permitting all future trust interest to be deposited into the SPAC's operating account for defendants' use, and continued to propose pro rata distribution of the Break-Up Fee to Founder shareholders. Id. ¶ 68. On November 14, 2025, shareholders voted down the Extension Proposal. Id. ¶ 69.

Following the failed vote, defendants announced on November 17, 2025 that NETD would redeem all outstanding Class A ordinary shares as of December 3, 2025, in exchange solely for amounts held in the Trust Account (expressly excluding the Break-Up Fee as part of their calculation). Id. ¶ 71. The defendants stated that the "redemption will completely extinguish public shareholders' rights

as shareholders (including the right to receive further liquidation distributions, if any)," positioning defendants, as Founder shareholders, to distribute NETD's remaining assets, including the Break-Up Fee, to themselves. Id. ¶¶ 72-73. On December 3, 2025, NETD redeemed all outstanding Class A shares at $11.35445 per share. Id. ¶ 74.

Plaintiff Camac Fund, LP, a Delaware limited partnership, purchased Class A Public Shares on or about November 18, 2025 (after the redemption announcement) and held those shares through the December 3, 2025 redemption. Id. ¶ 18.

### e. Litigation

Camac Fund filed this putative class action on behalf of all holders of Class A Public Shares as of the December 3, 2025 redemption date. Am. Compl. ¶ 77. The Amended Complaint asserts five counts: (1) a request for declaratory judgment that defendants have no entitlement to the Break-Up Fee and that it must instead be distributed to Class A holders; (2) breach of the Sponsor Agreement; (3) breach of the implied covenant of good faith and fair dealing; (4) conversion; and (5) a request for declaratory judgment that defendants are not entitled to indemnification for their alleged misconduct. Id. ¶¶ 87-119.

## II. Discussion

The Court grants the defendants' motion to dismiss for three independent reasons. First, NETD's Charter contains a broad,

6

exclusive forum selection clause that controls here. Second, Camac was not a party to the "Sponsor Agreement," nor a third-party intended beneficiary, and therefore cannot pursue a breach of contract claim on the basis of the Sponsor Agreement. And third, in any event, the defendants have not breached the Sponsor Agreement. The Court discusses each point in turn.

a. Forum Selection Clause

Camac Fund is a shareholder of Class A Public Shares of NETD. And NETD's Charter mandates that any action relating to NETD shareholder rights must be brought in the courts of the Cayman Islands. Specifically, the Charter states:

> Unless the Company consents in writing to the selection of an alternative forum, the courts of the Cayman Islands shall have exclusive jurisdiction over any claim or dispute arising out of or in connection with the Memorandum, the Articles or otherwise related in any way to each Member's shareholding in the Company, including but not limited to:
>
> (a) any derivative action or proceeding brought on behalf of the Company;
>
> (b) any action asserting a claim of breach of any fiduciary or other duty owed by any current or former Director, Officer or other employee of the Company to the Company or the Members;
>
> (c) any action asserting a claim arising pursuant to any provision of the Statute, the Memorandum or the Articles; or
>
> (d) any action asserting a claim against the Company governed by the "Internal Affairs Doctrine" (as such concept is recognized under the laws of the United States of America)

ECF No. 22, Ex. 1 ("Charter") at art. 52.1.

Forum selection clauses are generally enforceable. See Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 51 (2013) (noting that forum selection clauses are given "controlling weight in all but the most exceptional circumstances"); In re Refco Inc. Sec. Litig., 2009 WL 10666099 at *1 (S.D.N.Y. Nov. 20, 2009), adopted by 2010 WL 11500547 (S.D.N.Y. Jan. 21, 2010) (dismissing action on the basis of exclusive venue provision mandating Cayman adjudication). Moreover, "international comity dictates that American courts enforce these sorts of clauses out of respect for the integrity and competence of foreign tribunals." Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1361 (2d Cir. 1993).

The Second Circuit has articulated a four-part test for deciding a motion to dismiss on the basis of a forum selection clause. See Phillips v. Audio Active Ltd., 494 F.3d 378, 383-84 (2d Cir. 2007). The first inquiry is whether the clause was reasonably communicated. Id. at 383. The second question is whether the clause is mandatory or merely permissive. Id. The third issue is whether the claims and parties in the action are covered by the clause. Id. at 383. If the first three elements are met, the forum selection clause is "presumptively enforceable." Id. at 383-84. Such presumptive enforceability can be overcome only at the fourth step, if the party resisting enforcement can

"clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972).

Here, the first three elements are met with respect to each claim. As to the first inquiry, Camac does not argue that the forum selection clause was not reasonably communicated. Nor could it -- the clause here appeared in standard font and was stated in clear and unambiguous terms. See Effron v. Sun Line Cruises, Inc., 67 F.3d 7, 9 (2d Cir. 1995). As to the second element, Camac does not dispute that the Charter forum selection clause, which provides that the "courts of the Cayman Islands shall have exclusive jurisdiction" is mandatory, rather than permissive.

The third inquiry concerns whether the claims and parties in the action are covered by the forum selection clause. Camac disputes this element on two grounds. First, Camac argues that the forum selection clause does not apply because its claims relate to the Sponsor Agreement, and the Sponsor Agreement contains a forum selection clause that mandates litigation in New York. And second, Camac argues that even if the Charter's forum selection clause applied, its causes of action do not fall within any of the four categories of disputes listed in the Charter. Both arguments fail.

First, as to the Sponsor Agreement's forum selection clause, Camac's causes of action clearly fall within the scope of the

9

Charter, rather than the Sponsor Agreement. The Sponsor Agreement was an agreement between the defendants and the SPAC in which the defendants agreed to waive any entitlement to the SPAC's assets in the event of a liquidation following a failed business combination. But besides the breach of the Sponsor Agreement claim, each of Camac's other claims unambiguously relate to the Charter. For instance, Camac's first cause of action seeks a declaratory judgment as to the SPAC's residual assets. This concerns the Charter, which governs indemnification and residual-asset distribution, as well as how NETD's residual assets are to be divided between classes of shareholders. Charter at art. 44, 45, 49.7, 49.9; Am. Compl. ¶¶ 87-91. Similarly, Camac's implied covenant and conversion claims arise from the Charter because they raise the question of which shareholders have a "superior right to possession" to the settlement proceeds, raising questions as to shareholder rights (as opposed to any agreement between the defendants and the SPAC). The implied covenant claim, moreover, alleges conduct directed at the timing and substance of redemption and liquidation, which are regulated by articles 17, 44, and 49 of the Charter. Am. Compl. ¶ 106.

The breach of the Sponsor Agreement claim, though facially premised on the Sponsor Agreement, also fits more securely under the Charter. Specifically, Camac's claim seeks that the assets in the Trust Fund be distributed in a certain way, i.e., with an

10

accounting of the Break-Up Fee that does not benefit the Founding Members. Though the Sponsor Agreement allegedly established a promise from the defendants to disavow their rights to certain assets, it is actually the Charter that gives Camac a claim to the distribution of NETD's residual assets. Accordingly, it is the NETD Charter that controls this claim, rather than the Sponsor Agreement.

Camac's second contention is that, notwithstanding the Charter's applicability, the specific causes of action alleged are not governed by the Charter's forum selection clause. Camac asserts that the forum selection clause applies to only the four causes of action identified in the Charter, that is, (1) derivative actions, (2) breach of fiduciary duty or other duties, (3) actions relating to the Companies Act (As Revised) of the Cayman Islands, the memorandum of association of NETD, or the articles of association of NETD, or (4) claims against NETD governed by the "Internal Affairs Doctrine." Charter at art. 52.1.

Camac is correct that none of its claims map on to the four delineated categories of actions identified in the Charter, but the Court disagrees that the forum selection clause applies only to those listed examples. The broad lead-in language to the forum selection clause states that the Cayman Islands will have exclusive jurisdiction over "<u>any</u> claim or dispute arising out of or in connection with the Memorandum, the Articles or otherwise related

in any way to each Member's shareholding in the company," and additionally notes that the examples listed are "include[ed]" in the forum selection clause, but that the clause is not "limited to" those categories of claims. Charter at art. 52.1 (emphasis added). This language indisputably encompasses the causes of actions here: Camac's argument on behalf of the putative class is that the Founders have no right to the Break-Up Fee and that the fee should be distributed to the class members -- in other words, a dispute over the "Member's shareholding in the company." Charter at art. 52.1.

With the Phillips elements established, it is Camac's burden to demonstrate that enforcing the Charter would be "unreasonable and unjust" or that the clause is invalid for reasons such as "fraud or overreaching." Bremen, 407 U.S. at 15. But Camac does not press such arguments. For the foregoing reasons, the forum selection clause in the Charter controls, and requires this litigation to have been brought in the Cayman Islands.

b. Enforceability of the Sponsor Agreement

Alternatively, even assuming arguendo that the breach of the Sponsor Agreement claim were not governed by the Charter's forum selection clause, Camac has not adequately pled a breach claim that it has standing to assert. Camac's breach of the Sponsor Agreement theory is that the defendants agreed to waive any entitlement to the SPAC's assets in the event of a liquidation

following a failed business combination and that the defendants breached this agreement by allegedly receiving proceeds from the Settlement. But Camac is neither a party to the Sponsor Agreement nor a third-party beneficiary that can enforce any rights under the Agreement.

It is clear that Camac is not a party to the Sponsor Agreement. It was not a signatory to the agreement and does not plead privity with any signatory. See Caravella v. City of New York, 79 F. App'x 452, 453 (2d Cir. 2003). Non-parties to a contract governed by New York law (which the Sponsor Agreement is governed by) cannot establish the elements required to enforce the agreement absent terms that suggest an intent to permit enforcement. Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009). And indeed, Camac does not dispute this issue; instead, Camac argues that it, as a public shareholder, is a third-party beneficiary of the contract and can sue to enforce its rights.

A third-party beneficiary must be an intended beneficiary of the underlying agreement. Specifically, while a "beneficiary of the contract" may enforce the contract on "a third-party beneficiary theory," Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., 2008 WL 250553, at *6 (S.D.N.Y. Jan. 28, 2008), enforcement is permitted only where the plaintiff pleads that the agreement was "intended for his benefit" and "that the benefit to him was

13

direct rather than incidental." <u>Solutia Inc. v. FMC Corp.</u>, 385 F. Supp. 2d 324, 336-37 (S.D.N.Y. 2005).

Camac cannot satisfy that standard. The Second Circuit's decision in <u>Consolidated Edison, Inc. v. Northeast Utilities</u>, 426 F.3d 524 (2d Cir. 2005) is particularly instructive. In that case, the court considered (1) whether shareholders were granted a right as third-party beneficiaries to sue another party, and (2) if so, whether the right to sue belongs to the shareholders who held shares at the time of the breach or if the right to sue could be "passed on," so to speak. <u>Id.</u> at 525. The Court answered <u>no</u> as to the first question, and therefore did not take up the second.

Here, the Sponsor Agreement contemplated certain categories of third-party beneficiaries, and public shareholders were not among them. <u>See</u> ECF No. 22, Ex. 6 at 2. In <u>Consolidated Edison</u>, the Second Circuit held that public shareholders were not the third-party intended beneficiaries of the contract at issue, based on the contracting parties' intent "as derived from the language employed in the contract." 426 F.3d at 527. The court rested that conclusion on several grounds, but the most relevant here are (1) the agreement's explicit statement that no third-party rights existed except for those enumerated, and (2) the overall context and structure of the agreement. Both considerations apply here. Like the agreement in <u>Consolidated Edison</u>, the Sponsor Agreement "constitutes the entire agreement and understanding of the parties

14

hereto," ECF No. 22, Ex. 6 at 7, and it plainly enumerates certain persons -- the "Sponsor Indemnitee[s]" -- as intended "third party beneficiaries." Id. at 3. Together, these provisions reflect the contracting parties' intent to benefit only certain third parties, with public shareholders conspicuously absent from that list.

To be sure, Consolidated Edison is not on all fours with this case. There, the agreement contained language expressly stating that it did not "confer [rights or remedies] upon any person other than the parties" listed. 426 F.3d at 528. The Sponsor Agreement contains no such provision. See Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC, 692 F.3d 42, 53 (2d Cir. 2012) (explaining that a contract's reference to a specific third-party beneficiary may, at least at the pleadings stage, be read merely as clarifying that the named party is among the intended beneficiaries, not that it is the only one).

But this brings the Court to its second point: even if the Sponsor Agreement does not necessarily foreclose public shareholders from intended third-party beneficiary status, Camac's position as a later-purchasing stockholder bars it from asserting this claim. Camac purchased its shares after the Break-Up Fee had been disclosed and after shareholders had already been given an opportunity to claim their portion of the settlement proceeds. It therefore cannot plausibly claim to be a party whom the defendants, IPO underwriters, and others intended to benefit.

15

Camac nevertheless argues that the timing of its purchase and its knowledge of additional facts are irrelevant because the Complaint and class definition center on investors at the time of redemption. For support, it cites this Court's earlier opinion in Funicular Funds, LP v. Pioneer Merger Corp., 2023 WL 7182055, at *2-3 (S.D.N.Y. Nov. 1, 2023). But Funicular Funds is readily distinguishable. That case addressed Rule 23(a)'s typicality requirement, and did not resolve whether a plaintiff qualifies as a third-party beneficiary of a contract based on the timing of its stock purchase. Id. The question here is whether an agreement that conditioned payment on the occurrence of a specific qualifying event was intended to benefit a plaintiff like Camac, which purchased shares with full notice that defendants planned to distribute the Break-Up Fee among themselves. It was not.

To reach the contrary conclusion would be to hold not only that parties to the Sponsor Agreement intended to benefit public shareholders (despite no such mention on the face of the agreement), but also that they intended to confer rights and remedies on parties who purchased shares with full knowledge of the status of the Break-Up Fee. Such a reading finds no support anywhere in the Sponsor Agreement and conflicts with New York law, which requires that "the language of the contract" "clearly evidence[] an intent to permit enforcement by the third party[.]"

16

Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc., 66
N.Y.2d 38, 45 (1985).[1]

### c. Breach of the Sponsor Agreement

Third, even assuming arguendo that Camac holds the rights of
an intended third-party beneficiary by virtue of its stock
purchase, no qualifying event has occurred that would establish a
breach of the Sponsor Agreement. The Agreement provides that "[t]he
Sponsor and each Insider acknowledges that it, he or she has no
right, title, interest or claim of any kind in or to any monies
held in the Trust Account or any other asset of the Company as a
result of any liquidation of the Company with respect to the
Founder Shares." ECF No. 22, Ex. 6 at 3 (emphasis added). A breach
could therefore occur only if the defendants claimed money from
the Trust Account following a liquidation. But NETD never
liquidated. Camac's brief effectively concedes as much, premising
its theory on the allegation that a liquidation event will occur

---

[1] The interesting question that remains, however, not addressed in
either party's briefing, is whether a third-party intended
beneficiary right is transferred between shareholders. That is,
assuming public shareholders are intended third-party
beneficiaries of the Sponsor Agreement, and setting aside whether
Camac independently qualifies as an explicitly contemplated
beneficiary, does Camac acquire third-party beneficiary status by
virtue of purchasing shares from another shareholder? Consolidated
Edison offers no guidance on this question, and it appears to
remain an open one in this Circuit. But because Camac failed to
make this argument in its brief, it cannot assert it now.

at some point in the future. See Opp. Br. at 22 ("Defendants do not deny that they are actively executing a plan.").

Nevertheless, Camac argues that it is "not required to wait until the ongoing scheme is perfected to bring suit." Id. at 22. But its support for this assertion rests on two cases, neither of which stands for the proposition that a breach of contract claim can be brought before the breach has occurred and without actual indication from the defendant that they intend not to perform. See 2512 7th Ave. Hous. Dev. Fund Co., Inc. v. Webb & Brooker, Inc., 238 A.D.3d 438, 438 (1st Dep't 2025) (anticipatory breach claim could survive because the claim adequately pleaded an "express and absolute refusal to perform"); Audthan LLC v. Nick & Duke, LLC, 42 N.Y.3d 292, 303 (2024) (under New York law, there must be an express and absolute refusal to perform that is positive and unequivocal). In fact, courts regularly conclude otherwise. See No Hero Entps. B.V. v. Loretta Howard Gallery Inc., 2014 WL 10936545, at *3 (S.D.N.Y. May 28, 2014); see also ATG Cap. LLC v. MGT Cap. Invest., Inc., 2018 WL 1406917, at *7 (S.D.N.Y. Mar. 19, 2018) (explaining that, in Consolidated Edison, the right to bring a breach of contract never arose because the necessary prerequisite step for a breach -- an acquisition -- was never completed).

Camac further argues that, notwithstanding defendants' decision not to formally initiate liquidation proceedings, their conduct is functionally equivalent to liquidation. But even

18

assuming that is true -- that defendants are "winding up" for liquidation despite the absence of any formal paperwork to that effect[2] -- it would not carry the day. The Sponsor Agreement's provision is triggered only by formal liquidation, because that is what the parties agreed to. See ECF No. 22, Ex. 6 at 3. And "[w]here the contract is clear and unambiguous on its face, the courts must determine the intent of the parties from within the four corners of the instrument." Meccico v. Meccico, 76 N.Y.2d 822, 824 (1990) (citation omitted). Accordingly, in the absence of a formal liquidation, the Court has no option but to dismiss the breach of the Sponsor Agreement claim.

III. Conclusion

For each of the foregoing reasons, the Court grants the defendants' motion to dismiss in its entirety. The Clerk of Court is respectfully directed to enter judgment in favor of the defendants and close this case.

SO ORDERED.

New York, NY
June 22, 2026

_____
JED S. RAKOFF, U.S.D.J.

---

[2] The Amended Complaint does not allege that the defendants have effectively liquidated. Instead, it asserts only that the defendants have actually liquidated. SAC ¶ 100.

19